John T. Jasnoch (CA 281605)
jjasnoch@scott-scott.com
**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
600 W. Broadway, Suite 3300
San Diego, CA 92101
Tel.: 619-233-4565
Fax: 619-233-0508

*Attorney for Plaintiffs and the Proposed Class*

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| MATT PASQUINELLI and BRYAN PAYSEN, Individually and on Behalf of All Others Similarly Situated,<br><br>               Plaintiffs,<br><br>     v.<br><br>HUMBL, LLC, BRIAN FOOTE, JEFFREY HINSHAW, and GEORGE SHARP,<br><br>               Defendants. | Case No.  '22CV0723 AJB BLM<br><br>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>DEMAND FOR JURY TRIAL |

CLASS ACTION COMPLAINT

Plaintiffs Matt Pasquinelli and Bryan Paysen ("Plaintiffs"), individually and on behalf of all others similarly situated, bring this Class Action Complaint ("Complaint") against HUMBL LLC ("HUMBL" or the "Company"), its Chief Executive Officer, Brian Foote, its Chief Financial Officer, Jeffrey Hinshaw, and its Capital Markets Advisor, George Sharp (together with HUMBL, the "Defendants"). The following allegations are based upon personal knowledge as to Plaintiffs' own acts, upon investigation by Plaintiffs' counsel, and upon information and belief where facts are solely in possession of Defendants.

## NATURE OF THE CASE

1.     This is a federal securities class action on behalf of a class consisting of all persons and entities other than Defendants that purchased or otherwise acquired HUMBL common stock and/or the unregistered HUMBL ETX securities between November 21, 2020 and the filing of this action, both dates inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, and Sections 5 and 12(a)(1) of the Securities Act of 1933 against the Company and certain of its top officials.

2.     Throughout the Class Period, Defendants made materially false and misleading statements regarding the Company's business and operations. Specifically, Defendants made false and/or misleading statements and/or failed to disclose (1) that the HUMBL Pay App did not have even the basic functionality that it promised investors; and (2) that several of its hyped international business partnerships had a very low chance of contributing material revenues to the Company's bottom line. As a result, the Company's public statements were materially false and misleading at all relevant times.

3.     Defendants also sold a series of highly speculative unregistered securities called BLOCK Exchange Traded Index ("ETXs") products. These

CLASS ACTION COMPLAINT

products purported to "simplify digital asset investing" for customers seeking exposure to cryptocurrency investments. Instead, they were unregistered securities that were collateralized by a variety of highly speculative and risky digital assets.

4. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiffs and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

5. The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

6. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and Section 27 of the Exchange Act.

7. Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1391(b). HUMBL is headquartered in this Judicial District, Defendants conduct business in this Judicial District, and a significant portion of Defendants' activities took place within this Judicial District.

8. In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

### *Plaintiffs*

9. Plaintiffs, as set forth in the attached Certifications, acquired HUMBL securities, including HUMBL common stock and ETX products, at artificially inflated prices during the Class Period and were damaged upon the revelation of the alleged corrective disclosures.

10. Plaintiff Matt Pasquinelli is a resident and citizen of Pennsylvania, living in Canonsburg, Pennsylvania. Plaintiff Pasquinelli purchased HUMBL common stock as well as unregistered BLOCK ETX securities and suffered investment losses as a result of Defendants' conduct.

11. Plaintiff Bryan Paysen is a resident and citizen of Texas, living in Round Rock, Texas. Plaintiff Paysen purchased HUMBL common stock and suffered investment losses as a result of Defendants' conduct.

***Defendants***

12. Defendant HUMBL LLC is a Delaware corporation with its principal executive offices located at 600 B Street, Suite 300, San Diego, CA 92101. The Company's common stock trades in OTC under the ticker symbol "HMBL." The company's unregistered securities, the BLOCK Exchange Traded Index products, are known as "BLOCK ETXs."

13. Defendant Bryan Foote ("Foote") is a resident and citizen of California, living in San Diego, California. Foote has served as HUMBL's CEO at all relevant times.

14. Defendant Jeffrey Hinshaw ("Hinshaw") is a resident and citizen of California, living in San Diego, California. Hinshaw has served as HUMBL's Chief Financial Officer at all relevant times.

15. Defendant George Sharp ("Sharp") is a resident and citizen of Arizona, living in Scottsdale, Arizona. Sharp previously served as an advisor to HUMBL and currently serves as Capital Markets Advisor.

16. Defendants Foote, Hinshaw, and Sharp are sometimes referred to herein as "Individual Defendants."

17. The Individual Defendants possessed the power and authority to control the contents of HUMBL's SEC filings, press releases, and other market communications. The Individual Defendants were provided with copies of HUMBL's SEC filings and press releases alleged herein to be misleading prior to

1    or shortly after their issuance and had the ability and opportunity to prevent their
2    issuance or to cause them to be corrected.   Because of their positions with
3    HUMBL, and their access to material information available to them but not to the
4    public, the Individual Defendants knew that the adverse facts specified herein had
5    not been disclosed to and were being concealed from the public, and that the
6    positive representations being made were then materially false and misleading.
7    The Individual Defendants are liable for the false statements and omissions
8    pleaded herein.

9                                **FACTUAL ALLEGATIONS**

10       **The Company Background**

11       18.   HUMBL is a mobile financial services company based in San Diego,
12   California.   HUMBL states that its mission is to help companies and businesses
13   rapidly migrate to the digital economy.  The Company describes itself as a "Web 3,
14   digital commerce platform" that offers the following "three interconnected product
15   verticals": (1)  HUMBL Pay ("A mobile app that allows peers, consumers and
16   merchants to connect in the digital economy."); (2) HUMBL Marketplace ("A
17   mobile marketplace that allows consumers and merchants to connect more
18   seamlessly in the digital economy."); and (3) HUMBL Financial ("Financial
19   products and services, targeted for simplified investing on the blockchain.").[1]

20       19.   In its go-public presentation, HUMBL compared HUMBL's role in
21   the development of Web 3 to the role of Apple and Amazon in the development of
22   computing and the internet.

23       20.   After issuing several press releases setting forth a roadmap for its
24   future, HUMBL went public in late 2020 when it engaged in an opaque reverse
25   merger transaction whereby it merged with a dormant flooring products business.

26

27   [1]
           https://www.sec.gov/Archives/edgar/data/0001119190/000149315221030031/forms-1.htm (last visited May 18, 2022).
28

21.    In the following weeks and months, the Company's market capitalization peaked at approximately $50 billion on a fully diluted basis on the back of extreme hype generated by Defendants' bullish statements regarding HUMBL's business prospects.

**Defendants Make Materially False Statements**

22.    Leading up to HUMBL going public, the Company issued a series of press releases touting the Company's global reach and ability to disrupt traditional industries like payments and banking.

23.    For example, on March 20, 2020, HUMBL issued a press release entitled "HUMBL Partners With Digital India Payments (DIPL) To Enter India Market."  In that press release, the Company announced a deal with Digital India Payments, a company that processes payments for 30,000 merchants in India, Nepal, Bangladesh, Maldives, Myanmar, and Sri Lanka.  In announcing the deal, Defendant Foote was quoted as saying "We look forward to putting HUMBL technologies to work for 1.4 billion India customers" and HUMBL noted that it would offer "walk-in services to customers, such as cash pickup, foreign exchange, fair lending, bill payments, pre-paid cards, store credits, travel bookings, internet and cell phone minutes from local merchant ('agent') locations."

24.    On April 3, 2020, HUMBL issued a press release entitled "HUMBL and One Kiosk Team Up On Africa Home Delivery Network" in which the Company announced a deal with Nigerian-based One Kiosk, a company that brings together merchants and online delivery services.  One Kiosk's CEO stated at the time that his company had seen a boom in online ordering due to the COVID-19 pandemic and he believed an ability to pair the company's service with HUMBL's financial services would be a "powerful economic driver."  Defendant Foote stated that HUMBL would use its platform to help local small businesses compete with larger companies, noting that "HUMBL helps them get in the game against big box competitors."

CLASS ACTION COMPLAINT

25.     On November 12, 2020, HUMBL announced a reverse merger with Tesoro Enterprises, Inc., which allowed it to become a publicly traded company. In an all-stock transaction, the members of HUMBL received preferred shares of Tesoro in exchange for their HUMBL holdings.  In announcing the merger, a press release stated:

> HUMBL has designed a mobile wallet (HUMBL) and merchant software (HUMBL Hub), that help primarily cash economies migrate to digital money services across key vertical markets, such as: government, banking, wireless carriers and merchant services. HUMBL's global money platform will deliver up to 50% estimated savings on transactions such as: sending, receiving, lending, borrowing, investing money and paying bills.

26.     The November 12, 2020, press release announcing the reverse merger omitted material facts from investors.  For example, the press release only stated that Defendant Foote had acquired "the control block of voting shares" as well as "a significant number of common shares."

27.     The day after the merger announcement, the Company issued a press release stating that Defendant Foote had "retired" 551 million shares without consideration, significantly lowering the overall share count.

28.     Shortly thereafter on November 17, 2020, HUMBL issued another press release announcing that Defendant Foote would "lock up" an additional 318 million common shares.  The press release stated:

> Tesoro Enterprises, Inc. (OTC Pink: TSNP) ("Tesoro") announced today that the company's CEO and President, Brian Foote, has agreed to convert over 318 million shares recently purchased by him out of the retail market to a new class of Preferred shares.

> The conversion will be transacted following the imminent completion of the merger between Tesoro and HUMBL LLC, which will coincide with the redomiciling of the corporation to Delaware.

> Upon completion of the conversion, Tesoro's issued and outstanding number of common shares will have been reduced by over 860 million shares since Mr. Foote became President of Tesoro.

> The company does not anticipate that the number of common shares outstanding will increase during the remainder of 2020 and throughout 2021.

29.   On November 24, 2020, HUMBL issued a press release entitled "HUMBL Partners with Cyberbeat to Expand into Asia Pacific and Pan-India Vertical Markets" which announced that the Singapore-based company, Cyberbeat, was making a strategic investment into HUMBL.  The release brags that Cyberbeat is "a leading digital payments and financial technologies company led by veteran digital payment industry executives of the Asia Pacific region" and that Cyberbeat "gains the non-exclusive rights to sell, distribute and deploy HUMBL and HUMBL Hubs technologies into key verticals in the Asia Pacific in calendar year 2021 and beyond."  HUMBL noted that the Company viewed the deal as an "opportunity to establish this global relationship with a proven winner in the Asia Pacific region[.]"

30.   On December 1, 2020, HUMBL issued a press release entitled "HUMBL Mobile App and HUMBL Hub Merchant Solutions Deliver Successful Pilot Transactions Between United States and Mexico."  In this release, HUMBL announced a purportedly successful pilot project with merchants in Mexico and quoted a tour operator named Fernando Cuevas who noted that HUMBL "makes life easier for me, my business and my customers here in Mexico" and that HUMBL's digital payments "enables my customers to spend more time enjoying their trips, and less time seeking out ATM's and cash payment options everywhere we go."

31.   The reverse merger closed on December 3, 2020.  The reverse merger was shepherded by OTC investor Defendant George Sharp, who described himself during HUMBL's debut webcast as "an advocate for shareholder rights and honesty in the OTC."

32.   In the December 9, 2020, conference call with investors, a shareholder inquired what had been built on the Pay App.  Defendant Foote falsely stated that "Right now, in the barn, we have – send money, request money, exchange money, stable coins."

33.     Also on the December 9, 2020 conference call, Defendant Foote explained that one reason that HUMBL is based in San Diego is the proximity to the Mexican market, stating that "Part of the reason our business was born here is the majority of merchants in Mexico are in cash still, like physical paper bills and coins."  Foote falsely stated that the Company was surprised by the strong demand for the app in Mexico, noting that "I challenged our Mexico sales team.  I said 'OK. Go sign up 100 merchants in a week.'  They came back with 300 merchants in three days."

34.     On December 9, 2020, HUMBL posted a video to its website called "A Borderless Day in Baja" which featured a group of visitors touring Mexico with tour guide Cuevas, using HUMBL to pay merchants and transfer money to each other.

35.     On January 22, 2021, in a letter to shareholders, Defendant Foote told investors that the Company had secured "our first of multiple option payments on the distribution rights deal in Oceania region" with "plans to enter the region with this group."  It was later announced that an Australian entity called Tuigamala Group Pty Ltd. ("TGP") had paid $600,000 in December for an option to purchase territory rights, with plans to invest an aggregate $15 million.  The $600,000 payment also granted TGP 12.5 million warrants at $1 each.

36.     In response to the Company's international partnership announcements, the stock price soared, reaching its peak price of $6.84 on February 8, 2021.

37.     On February 25, 2021, HUMBL took advantage of the inflated stock price to announce that FINRA processed recent corporate actions, including the name change from Tesoro to HUMBL, and that the Company executed a one for four reverse split of its common stock and made other changes to its share structure.  HUMBL's COO and Corporate Secretary, Jeffrey Hinshaw, stated:

> The company's Board of Directors concluded that it was important to quell the volatility in the share price.  Prospective investors and

current shareholders were concerned that it was difficult to pinpoint the true value of the common shares.  Furthermore, this will force any outstanding short positions to cover their position.  The board was also sympathetic to the need not to wipe out the holdings of the shareholders, and therefore determined that this small reverse split would satisfy both requirements.

38.     Thereafter Defendant Sharp attempted to downplay the concern shareholders expressed about the corporate action and assuage those who were concerned about potential dilution, stating: "If you're worried about dilution, don't be."  Sharp also told investors that he was doing them a favor by being opaque about the Company's actions, such as the surprise reverse stock split, stating, "I have made the conscious decision that we were not going to tell you . . ."

39.     The price of HUMBL stock declined following the announcement of the reverse split, but the downplaying of the potential dilution by the Company and Defendant Sharp, coupled with a continued string of announcements about HUMBL's international partnerships and growth prospects, kept the stock price artificially inflated.

40.     For example, on March 16, 2021, HUMBL issued a press release entitled "HUMBL, Inc. Announces Aurea Group Ventures Investment and Partnership for Exclusive Chile Country Rights" which announced an international deal with a Chilean entity named the Aurea Group.  The release noted that the partners are "already underway on HUMBL Latin America business development discussions in key verticals such as: banking, merchant and financial services, real estate, hospitality, tourism, sports, festivals, entertainment and ticketing services in the region."

41.     On April 1, 2021, HUMBL issued a press release entitled "HUMBL Announces Launch of BLOCK Exchange Traded Index (ETX) Products in the United States."  This release stated:

HUMBL, Inc. (OTCMARKETS: HMBL) announced today the planned availability of its BLOCK Exchange Traded Index (ETXs) products to United States customers beginning on April 2, 2021.

9

HUMBL Financial™ created its BLOCK ETX products to simplify digital asset investing for customers and institutions seeking exposure to a new, 24/7 digital asset class.

HUMBL Financial has developed proprietary, multi-factor blockchain indexes, trading algorithms and financial services for the new digital asset trading markets.

BLOCK ETXs comprise over 20,000 lines of proprietary code and are architected across index, active and thematic investment strategies.

BLOCK ETXs are completely non-custodial, algorithmically driven software services that allow customers to purchase and hold digital assets in pre-set allocations through their own digital asset exchange accounts.

BLOCK ETXs will be compatible for United States customers who have accounts with Coinbase Pro, Bittrex US or Binance US.

BLOCK ETXs are also available to non-US customers who have accounts with Bittrex Global.

BLOCK ETXs will be served first on the desktop and web version of the HUMBL platform, with the goal of future applications inside the HUMBL Mobile Application.

HUMBL Financial is open to the licensing of the BLOCK ETXs to institutions and exchanges.

HUMBL Financial also plans to offer trusted, third party financial services in areas such as payments, investments, credit card services and lending across the HUMBL platform over time.

42.   On April 16, 2021, HUMBL issued a press release announcing the launch of its Pay App.  The press release stated that the app will "allow customers to discover merchants; as well as pay, tip, rate and review those same merchants in contactless transactions."  The press release further noted that the company "has also integrated ticketing" into the Pay App, to allow customers "to find and purchase tickets to live events" while highlighting the phased rollout beginning in the United States and thereafter being launched in several countries throughout the world.

**The Truth Begins to Emerge**

43.   On May 20, 2021, Hindenburg Research published a research report entitled "HUMBL: Illusions of Grandeur, Collapsing International Deals, And

1  Lurking Dilution" (the "Hindenburg Report").   This report called into serious
2  question the business and financial prospects of HUMBL.

3      44.    For example, the Hindenburg Report stated that despite the previous
4  statements concerning the working features of the Pay App, basic features were
5  still not functioning.  Researchers with Hindenburg found that there was no way to
6  send, receive, or request money between users or to even know which users were
7  on the platform.  Furthermore, there was no indication that users could do anything
8  with stablecoins.

9      45.    The Hindenburg Report also analyzed the reviews that the Pay App
10  received on the Apple App Store.  Despite the shortcoming of the functionality, the
11  app immediately received a suspiciously high number of positive reviews in the
12  days following the launch.  In the following weeks, however, the number of Apple
13  App Store reviews plummeted, trickling off to zero new reviews in the weeks
14  following the launch, indicating coordinated efforts to influence perceptions
15  around the app.

16      46.    For example, the Hindenburg Report highlighted a five-star review
17  praising the app's ability to "send money back and forth between family and
18  friends" a feature the Hindenburg Report noted that the Pay App was unable to do.
19  Similarly, another misleading five-star reviewer claimed to be deleting Robinhood,
20  PayPal, Venmo, and Etsy because the Pay App does everything those apps do,
21  which was untrue based on the Hindenburg Report's analysis of the Pay App.

22      47.    Despite the press release announcing the Pay App, explaining that
23  users would be able to "discover merchants; as well as pay, tip, rate and review
24  those same merchants in contactless transactions" the Hindenburg Report found
25  that discovering merchants on the system was problematic in that almost all of the
26  merchants appeared to be in San Diego or New York City.  Further, searches for a
27  region pulled up inaccurate listings, including merchants far outside of the region.
28  Even if a merchant could be successfully located, the vast majority of the

merchants just didn't accept HUMBL.  The Hindenburg Report noted that out of 200 merchant listings on HUMBL Pay, just nine merchants were identified as taking payments via the Pay App.  When Hindenburg researchers contacted the supposed HUMBL Pay-accepting merchants, a sampling of responses stated that they had "never heard of it."

48.    The Hindenburg Report also called into question the viability of the HUMBL Marketplace, where merchants can purportedly operate an online business and accept online payments for their products.  These merchants, however, did not receive payments via HUMBL.  Instead, the Hindenburg Report noted that transactions were being processed by Stripe, one of the largest online payment processors in the world and a direct competitor to HUMBL.

49.    With respect to the ETX unregistered securities products, the Hindenburg Report noted the convoluted process required to access the ETX products.  Although HUMBL boasted that it developed 20,000 lines of proprietary code to create its trading strategies, the strategies appear to be simple rebalancing of assets.  For example, when Hindenburg researchers signed up for the Block 3 product, its portfolio was 50% BTC, 25% ETH, and 25% Litecoin.  Later, the allocation simply shifted to 50% BTC, 25% Litecoin, and 25% Digibyte.

50.    With respect to HUMBL's Mexican operations, the Hindenburg Report noted that, in contrast to Defendant Foote's statements on the December investor conference call, researchers could not find anywhere near 300 merchants on HUMBL Pay in Mexico.  Using the map feature, Hindenburg researchers located only 19 merchants in total and identified two as purportedly accepting HUMBL payments.  One merchant was "told that they had the HUMBL system but had not yet been trained on it" while the other "had never heard of HUMBL[.]"

51.    The Hindenburg Report also called into question the account of the tour guide, Fernando Cuevas.  Although HUMBL announced that HUMBL Pay had launched in Mexico, when Hindenburg researchers contacted Cuevas, they

1  found that HUMBL's previous statements were inaccurate.  Cuevas, who was also

2  HUMBL's "lead affiliate sales representative in the region" indicated that the app

3  wasn't ready, and that until modifications were made to the app, no merchants in

4  Mexico would be able to use it.  The Hindenburg Report then noted that Cuevas

5  quickly deleted his messages and told researchers that he couldn't speak on the

6  matter further.

7     52.    A winery and wine bar featured in the "Borderless Day in Baja" video

8  contacted by Hindenburg also disavowed the use of HUMBL.  All told, the

9  Hindenburg researchers found no sign that HUMBL was revolutionizing the

10  payments business in Mexico.

11     53.    With respect to the Indian partnership, Hindenburg researchers spoke

12  with Nayan Raut, the individual listed as the contact in the press release

13  announcing the deal.  He told Hindenburg that the partnership never actually went

14  ahead, because Digital India Payments' agent network shut down due to the

15  pandemic.  Moreover, Raut noted that there were longer term issues, including that

16  government regulations in India do not allow a payment platform to charge

17  merchants or consumers any percentage, significantly hampering HUMBL's

18  planned business model.

19     54.    Summing up the Digital India Payments partnership, the Hindenburg

20  Report noted succinctly that "beyond the press release, HUMBL's India deal didn't

21  happen, probably won't happen, and if it somehow did happen, wouldn't make

22  HUMBL any money due to regulatory hurdles."

23     55.    With respect to the One Kiosk partnership in Nigeria, Hindenburg

24  reached out to Olatunbosun Babatunde, One Kiosk's Chief Technology Officer.

25  Babatunde, who thanked Hindenburg researchers for the inquiry and revealed that

26  "HUMBL actually reach[ed] out to us and they wanted One Kiosk to use their

27  payment system on our platform as a way of entering the African market.  But it

28  never went beyond that."

56. As to HUMBL's Oceania partnership, the Hindenburg Report disclosed that there was no online or physical evidence of HUMBL's purported partner TPG beyond filings with the Australian Securities and Investments Commission. The entity was created on September 16, 2019, and is owned by Julius Elisara Tuigamala. Far from having a significant foothold in the region with a network of merchants or consumers, the company's principal place of business simply appears to be Tuigamala's house in New Zealand.

57. HUMBL's purported "strategic investment" from "proven winner" Cyberbeat was similarly revealed to be misleading. As the Hindenburg Report noted, Cyberbeat had only been incorporated in December 2019 and that LinkedIn only listed two employees, the two directors in local Singapore government filings. While it is unclear how much Cyberbeat actually invested in HUMBL, Cyberbeat and its two employees received Series B preferred shares convertible into 15,930,000 HUMBL common shares (valued at approximately $14M at the time of the Hindenburg Report's exposé). Six months following the announcement of the deal, the Hindenburg Report found no evidence that any specific initiatives or business had resulted from the purported deal.

58. With respect to the Chilean partnership, the Hindenburg Report detailed that the Aurea Group had only been incorporated for a year before the HUMBL deal was announced. The Aurea CEO even told Hindenburg researchers by phone that HUMBL was only "the first company we have formed an alliance with . . . ." Similarly, the Hindenburg Report noted that HUMBL had yet to articulate an actionable strategy for partnering in Chile with a technology or payment company.

59. Following the publication of the Hindenburg Report and the revelations regarding years of misleading statements by the Company, the price of HUMBL stock dropped significantly from approximately $0.98 on May 19, 2021

to $0.76 on May 20, 2021.  Moreover, the May 20, 2021 price represented an 88.8% drop from inflated peak price of $6.84 in February 2021.

60.    Despite the publication of the Hindenburg Report, the Company continued to take actions to mislead and damage shareholders.  For example, on October 29, 2021, HUMBL issued a press release entitled "HUMBL Announces Amendment to Certificate of Incorporation to Institute Preferred B Conversion Limits."  This press release noted that shareholders who own more than 750 Series B shares will be subject to limitations on how many Series B shares can be converted into common stock in any given month from December 2021 through May 2023.  The Series B preferred shares can each be converted into 10,000 common shares.  While those who own more than 750 Series B shares were subject to the limitations, the restrictions did not apply to various shareholders that owned less than 750 Series B shares each.

61.    Beginning in December 2021, HUMBL shareholders were subjected to an extreme amount of dilution as owners of Series B shares began to convert into common stock.  This was the dilution that shareholders were told not to worry about during the reverse merger transactions.  For example, as of December 23, 2021, there were 947.3 million shares of common stock outstanding.  By April 25, 2022, there were 1.429 billion shares of common stock outstanding.  This was an increase of over 50% of the outstanding common shares as of December 23, 2021.  The extreme dilution coincided with extremely high transaction volume and a sharp drop in the price of HUMBL common stock.  As of December 23, 2021, the stock price was approximately $0.39 per share; by April 25, 2022, the price had dropped all the way to $0.11 on high volume throughout the period.

62.    On February 14, 2022, HUMBL issued a press release entitled "HUMBL Suspends BLOCK ETX Subscription Products" whereby it announced that it was suspending the ETX subscription program.  Defendant Foote stated, "We do not believe that our non-custodial, algorithmically driven, software-as-a-

1    service- BLOCK ETX subscription products are securities, nor that the underlying

2    digital assets are securities" adding that "after additional dialogue with the SEC

3    surrounding our S-1 filing, we've determined this is the best path forward in the

4    approval process."

5         63.    As of the filing of this complaint, the price of HUMBL common stock

6    has not recovered.

7        **The BLOCK ETX Products Are Securities**

8         64.    Under Section 2(a)(1) of the Securities Act, a "security" is defined to

9    include an "investment contract." 15 U.S.C. §77b(a)(1). An investment contract is

10    "an investment of money in a common enterprise with profits to come solely from

11    the efforts of others." *S.E.C. v. W.J. Howey Co.*, 328 U.S. 293, 301 (1946).

12    Specifically, a transaction qualifies as an investment contract and, thus, a security

13    if it is: (1) an investment; (2) in a common enterprise; (3) with a reasonable

14    expectation of profits; and (4) to be derived from the entrepreneurial or managerial

15    efforts of others. *See United Housing Foundation, Inc. v. Forman*, 421 U.S. 837,

16    852-53 (1975). This definition embodies a "flexible rather than a static principle,

17    one that is capable of adaptation to meet the countless and variable schemes

18    devised by those who seek the use of the money of others on the promise of

19    profits," and thereby "permits the fulfillment of the statutory purpose of

20    compelling full and fair disclosure relative to the issuance of 'the many types of

21    instruments that in our commercial world fall within the ordinary concept of a

22    security.'" *W.J. Howey Co.*, 328 U.S. at 299. Accordingly, in analyzing whether

23    something is a security, "form should be disregarded for substance," and the

24    emphasis should be "on economic realities underlying a transaction, and not on the

25    name appended thereto." *Forman*, 421 U.S. at 849.

26         65.    Investors who bought BLOCK ETX products invested money or other

27    valuable consideration in a common enterprise. Investors had a reasonable

28

1    expectation of profit based upon the efforts of the Defendants, including, among
2    other things, Defendants' proprietary trading codes.

3    66.    Class members invested fiat, including U.S. dollars, and digital
4    currencies, such as Bitcoin and Ethereum, to purchase BLOCK ETX products.

5    67.    Defendants sold BLOCK ETX products to the general public through
6    the HUMBL website.

7    68.    Every purchase of BLOCK ETX products by a member of the public
8    is an investment contract.

9    69.    Additionally, investors were passive participants in the BLOCK ETX
10   products' rebalancing and the profits of each Plaintiff and the Class were
11   intertwined with those of Defendants.

12   70.    Defendants also were responsible for supporting the BLOCK ETX
13   products and its code.

14   71.    Investors in the BLOCK ETX products made their investment with a
15   reasonable expectation of profits.

16   72.    Investors' profits in the BLOCK ETX tokens were to be derived from
17   the managerial efforts of others – specifically the HUMBL, HUMBL Finance, and
18   any HUMBL personnel responsible for the proprietary trading codes.   BLOCK
19   ETX investors relied on the managerial and entrepreneurial efforts of HUMBL, the
20   Defendants, and others to manage, oversee, and/or develop the BLOCK ETX
21   program.

22                         **CLASS ALLEGATIONS**

23   73.    Plaintiffs bring this action, individually, and on behalf of nationwide
24   classes, pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2), and/or
25   23(b)(3), defined as follows:

26        All persons who, during the Class Period, purchased HUMBL
          securities were subsequently damaged thereby.
27
          [and]
28

CLASS ACTION COMPLAINT

All persons who, during the Class Period, purchased HUMBL BLOCK ETX products and who were subsequently damaged thereby.

74.     The Class Period is defined as the period between November 12, 2020 and the date of this filing.[2]

75.     Excluded from the Classes are: (a) Defendants; (b) Defendants' affiliates, agents, employees, officers and directors; (c) Plaintiffs' counsel and Defendants' counsel; and (d) the judge assigned to this matter, the judge's staff, and any member of the judge's immediate family.  Plaintiffs reserve the right to modify, change, or expand the various class definitions set forth above, based on discovery and further investigation.

76.     **Numerosity**: Upon information and belief, the Classes are so numerous that joinder of all members is impracticable.  While the exact number and identity of individual members of the Classes is currently unknown, such information being in the sole possession of HUMBL and/or third parties and obtainable by Plaintiffs only through the discovery process, Plaintiffs believe, and on that basis allege, that the Classes consists of at least hundreds of people.  The number of Class members can be determined based on HUMBL's and other third party's records.

77.     **Commonality**: Common questions of law and fact exist as to all members of the Classes.  These questions predominate over questions affecting individual Class members.  These common legal and factual questions include, but are not limited to:

a.     whether Defendants made false and misleading statements;

b.     whether the BLOCK ETX products are securities under the Securities Act;

---

[2]     Plaintiffs reserve the right to expand or amend the Class Period based on discovery produced in this matter.

c.  whether the sale of BLOCK ETX products violates the registration requirements of the Securities Act;

d.  whether Defendants improperly and misleadingly marketed BLOCK ETX products; and

e.  whether Plaintiffs and Class members have suffered damages, and, if so, the nature and extent of those damages.

78.  **Typicality**: Plaintiffs have the same interest in this matter as all Class members, and Plaintiffs' claims arise out of the same set of facts and conduct as the claims of all Class members.  Plaintiffs' and Class members' claims all arise out of HUMBL's uniform misrepresentations, omissions, and unlawful, unfair, and deceptive acts and practices related to the sale of BLOCK ETX products.

79.  **Adequacy**: Plaintiffs have no interest that conflicts with the interests of the Classes and are committed to pursuing this action vigorously.  Plaintiffs have retained counsel competent and experienced in complex consumer class action litigation.  Accordingly, Plaintiffs and their counsel will fairly and adequately protect the interests of the Classes.

80.  **Superiority**: A class action is superior to all other available means of fair and efficient adjudication of the claims of Plaintiffs and members of the Classes.  The injury suffered by each individual Class member is relatively small compared to the burden and expense of individual prosecution of the complex and extensive litigation necessitated by the Company's conduct.  It would be virtually impossible for individual Class members to effectively redress the wrongs done to them.  Even if Class members could afford individualized litigation, the court system could not.  Individualized litigation would increase delay and expense to all parties, and to the court system, because of the complex legal and factual issues of this case.  Individualized rulings and judgments could result in inconsistent relief for similarly situated individuals.  By contrast, the class action device presents far

fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

81.    Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief and corresponding declaratory relief with respect to the Class as a whole.

## PRESUMPTION OF RELIANCE

82.    Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

(a)    Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)    the omissions and misrepresentations were material;

(c)    HUMBL securities are traded in an efficient market;

(d)    the Company's securities were liquid and traded with moderate to heavy volume during the Class Period;

(e)    the Company's securities traded OTC in the United States;

(f)    the Company was covered by securities analysts;

(g)    the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

(h)    Plaintiffs and members of the Classes purchased, acquired, and/or sold HUMBL securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed without knowledge of the omitted or misrepresented facts.

83.    Based upon the foregoing, Plaintiffs and the members of the Classes are entitled to a presumption of reliance upon the integrity of the market.

84.    Alternatively, Plaintiffs and the members of the Classes are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of Utah v. U.S.*, 406 U.S. 128 (1972), as Defendants omitted material

information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## FIRST CAUSE OF ACTION

### Section 10(b) and Rule 10b-5
### (Against All Defendants)

85.   Plaintiffs restate and reallege all preceding allegations above as if fully set forth herein.

86.   This Count is asserted against Defendants and is based upon §10(b) of the Exchange Act, 15 U.S.C. §78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

87.   During the Class Period, Defendants engaged in a plan, scheme, conspiracy, and course of conduct pursuant to which they knowingly or recklessly engaged in acts, transactions, practices, and courses of business that operated as a fraud and deceit upon Plaintiffs and the other members of the Classes; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes, and artifices to defraud in connection with the purchase and sale of securities.  Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of HUMBL securities; and (iii) cause Plaintiffs and other members of the Classes to purchase or otherwise acquire HUMBL securities at artificially inflated prices.  In furtherance of this unlawful scheme, plan, and course of conduct, Defendants, and each of them, took the actions set forth herein.

88.   Pursuant to the above plan, scheme, conspiracy, and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the annual reports, SEC filings, press releases, and

other statements and documents, as described above, including statements made to securities analysts and the media, that were designed to influence the market for HUMBL securities.  Such reports, filings, releases, and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about HUMBL's business and operations.

89.    By virtue of their positions at HUMBL, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiffs and the other members of the Classes, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants.  Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth.  In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted, as described above.

90.    Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control.    As senior managers and/or directors of HUMBL, the Individual Defendants had knowledge of the details of HUMBL's internal affairs.

91.    The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein.  Because of their positions of control and authority, the Individual Defendants were able to, and did, directly or indirectly, control the content of the statements of HUMBL.  As officers and/or directors of a publicly held company, the Individual Defendants had duties to disseminate timely, accurate, truthful, and complete information with respect to HUMBL's businesses, operations, future financial condition, and future prospects.  As a result of the dissemination of the aforementioned false and misleading reports, releases, and public statements, the market price of HUMBL securities was artificially

1    inflated throughout the Class Period.  In ignorance of the adverse facts concerning
2    HUMBL's business and financial condition, which were concealed by Defendants,
3    Plaintiffs and other members of the Classes purchased or otherwise acquired
4    HUMBL securities at artificially inflated prices and relied upon the price of the
5    securities, the integrity of the market for the securities, and/or statements
6    disseminated by Defendants, and were damaged thereby.

7        92.   During the Class Period, HUMBL securities were traded on an active
8    and efficient market.  Plaintiffs and the other members of the Classes, relying on
9    the materially false and misleading statements described herein, which the
10   Defendants made, issued, or caused to be disseminated, or relying upon the
11   integrity of the market, purchased or otherwise acquired HUMBL securities at
12   prices artificially inflated by Defendants' wrongful conduct.  Had Plaintiffs and the
13   other members of the Classes known the truth, they would not have purchased or
14   otherwise acquired said securities, or would not have purchased or otherwise
15   acquired them at the inflated prices that were paid.  At the time of the purchases
16   and/or acquisitions by Plaintiffs and the Classes, the true value of HUMBL
17   securities was substantially lower than the prices paid by Plaintiffs and the other
18   members of the Classes.  The market price of HUMBL securities declined sharply
19   upon public disclosure of the facts alleged herein to the injury of Plaintiffs and
20   Class members.

21       93.   By reason of the conduct alleged herein, Defendants have knowingly
22   or recklessly, directly or indirectly, violated §10(b) of the Exchange Act and Rule
23   10b-5 promulgated thereunder.

24       94.   As a direct and proximate result of Defendants' wrongful conduct,
25   Plaintiffs and the other members of the Classes suffered damages in connection
26   with their respective purchases, acquisitions, and sales of the Company's securities
27   during the Class Period, upon the disclosure that the Company had been
28   disseminating misrepresented financial statements to the investing public.

## SECOND CAUSE OF ACTION

### Violations of §20(a) of the Exchange Act
### (Against the Individual Defendants)

95.     Plaintiffs restate and reallege all preceding allegations above as if fully set forth herein.

96.     During the Class Period, Defendants Foote, Sharp, and Hinshaw participated in the operation and management of HUMBL and conducted and participated, directly and indirectly, in the conduct of HUMBL's business affairs. Because of their senior positions, the Individual Defendants knew the adverse non-public information about HUMBL's current financial position and future business prospects.

97.     As officers and/or directors of a publicly owned company, the Individual Defendants had duties to disseminate accurate and truthful information, with respect to HUMBL's business practices, and promptly correct any public statements issued by HUMBL that had become materially false or misleading.

98.     Because of their positions of control and authority as senior directors or officers and executive team members, the Individual Defendants were able to, and did, control the contents of the various reports, press releases, and public filings that HUMBL disseminated in the marketplace during the Class Period concerning the Company's business, operational, and accounting policies. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause HUMBL to engage in the wrongful acts complained of herein. The Individual Defendants, therefore, were "controlling persons" of HUMBL within the meaning of §20(a) of the Exchange Act.  In this capacity, the Individual Defendants participated in the unlawful conduct alleged herein that artificially inflated the market price of HUMBL securities.

99.     The Individual Defendants, therefore, acted as controlling persons of HUMBL.  By reason of their senior management positions and/or being directors

of HUMBL, the Individual Defendants had the power to direct the actions of, and exercised the same to cause HUMBL to engage in the unlawful acts and conduct complained of herein.   The Individual Defendants exercised control over the general operations of HUMBL and possessed the power to control the specific activities that comprise the primary violations about which Plaintiffs and the other members of the Classes complain.

100.   By reason of the above conduct, Defendants Foote, Sharp, and Hinshaw are liable pursuant to §20(a) of the Exchange Act for the violations committed by HUMBL.

**THIRD CAUSE OF ACTION**

**Unregistered Offering and Sale of Securities in Violation of
Sections 5 and 12(a)(1) of the Securities Act
(Against All Defendants)**

101.   Plaintiffs restate and reallege all preceding allegations above as if fully set forth herein.

102.   Defendants, and each of them, by engaging in the conduct described above, directly or indirectly, made use of means or instruments of transportation or communication in interstate commerce or of the mails, to offer to sell or to sell securities, or to carry or cause such securities to be carried through the mails or in interstate commerce for the purpose of sale or for delivery after sale.

103.   BLOCK ETX products are securities within the meaning of Section 2(a)(1) of the Securities Act, 15 U.S.C. §77b(a)(1).

104.   Plaintiff Pasquinelli and members of the Classes purchased BLOCK ETX securities.

105.   No registration statements have been filed with the SEC or have been in effect with respect to any of the offerings alleged herein.   No exemption to the registration requirement applies.

106.   SEC Rule 159A provides that, for purposes of Section 12(a)(2), an "issuer" in "a primary offering of securities" shall be considered a statutory seller.

17 C.F.R. §230.159A(a).  The Securities Act, in turn, defines "issuer" to include every person who issues or proposes to issue any security.  15 U.S.C. §77b(a)(4).  HUMBL is an issuer of BLOCK ETXs.

107.  The U.S. Supreme Court has held that statutory sellers under §12(a)(1) also include "the buyer's immediate seller" and any person who actively solicited the sale of the securities to plaintiff and did so for financial gain.  *See Pinter v. Dahl*, 486 U.S. 622, 644 n.21 & 647 (1988); *accord*, *e.g.*, *Steed Finance LDC v. Nomura Sec. Int'l*, *Inc*., No. 00 Civ. 8058, 2001 WL 1111508, at *7 (S.D.N.Y. Sept. 20, 2001).  That is, §12(a)(1) liability extends to sellers who actively solicit the sale of securities with a motivation to serve their own financial interest or those of the securities owner.  *Dahl*, 486 U.S. at 647; *Capri v. Murphy*, 856 F.2d 473, 478 (2d Cir. 1988).  HUMBL and the Individual Defendants are all statutory sellers.

108.  By reason of the foregoing, each of the Defendants have violated Sections 5(a), 5(c), and 12(a) of the Securities Act, 15 U.S.C. §§77e(a), 77e(c), and 77l(a).

109.  As a direct and proximate result of Defendants' unregistered sale of securities, Plaintiffs and the Classes have suffered damages in connection with their BLOCK ETX purchases.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually, and on behalf of all others similarly situated, respectfully request that this Court:

A.     Determine that the claims alleged herein may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure and issue an order certifying one or more of the Classes defined above;

B.     Appoint Plaintiffs as representatives of the Classes and their counsel as Class counsel;

1       C.     Declare that the Company and Individual Defendants made false and

2  misleading statements with scienter, proximately causing Plaintiffs' losses;

3       D.     Declare that the Company and Individual Defendants offered and sold

4  unregistered securities in violation of Sections 5(a), 12(a), and 15 of the Securities

5  Act;

6       E.     Award all actual, general, special, incidental, statutory, rescission,

7  punitive, and consequential damages and restitution to which Plaintiffs and the

8  Class members are entitled;

9       F.     Award post-judgment interest on such monetary relief;

10       G.     Grant appropriate injunctive and/or declaratory relief;

11       H.     Award reasonable attorneys' fees and costs; and

12       I.     Grant such further relief that this Court deems appropriate.

13                       **JURY DEMAND**

14       Plaintiffs, individually and on behalf of the putative Class, demand a trial by

15  jury on all issues so triable.

16  DATED:  May 19, 2022        **SCOTT+SCOTT ATTORNEYS AT LAW LLP**

17                      *s/ John T. Jasnoch*

18                      John T. Jasnoch (CA 281605)
                    jjasnoch@scott-scott.com

19                      600 W. Broadway, Suite 3300
                    San Diego, CA 92101
                    Tel.: 619-233-4565

20                      Fax: 619-233-0508

21                      Sean T. Masson (*pro hac vice* forthcoming*)*
                    smasson@scott-scott.com

22                      **SCOTT+SCOTT ATTORNEYS AT LAW LLP**
                    The Helmsley Building

23                      230 Park Avenue,17th Floor
                    New York, NY 10169

24                      Tel.: 212-233-6444
                    Fax: 212-233-6334

25

26                      *Attorneys for Plaintiffs and the Proposed Class*

27

28

DocuSign Envelope ID: 4809DD93-B46C-423C-9C7A-ABD1BC775981

## <u>CERTIFICATION PURSUANT TO FEDERAL SECURITIES LAWS</u>

I, Matt Pasquinelli, hereby certify that the following is true and correct to the best of my knowledge information and belief:

1.      I have reviewed the complaint in this action and authorize Scott+Scott Attorneys at Law to file it on my behalf.

2.      I am willing to serve as a representative party on behalf of all persons and entities that purchased, or otherwise acquired, HUMBL securities.

3.      During the relevant period, I purchased and/or sold the security that is the subject of the complaint, as set forth in the attached **Schedule A.**

4.      I did not engage in the foregoing transactions at the direction of counsel nor in order to participate in any private action arising under the Securities Act of 1933 (the "Securities Act") or the Securities Exchange Act of 1934 (the "Exchange Act").

5.      During the three-year period preceding the date of my signing this Certification, I have not sought to serve, or served, as a representative party or lead plaintiff on behalf of a class in any private action arising under the Securities Act or the Exchange Act.

6.      I will not accept any payment for serving as a representative party on behalf of the Class beyond the *pro rata* share of any recovery, expert for such reasonable costs and expenses (including lost wages) directly related to the representation of the Class as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on _____ May, 2022 at _____ (city, state).
5/18/2022          Canonsburg, PA

DocuSigned by:

*Matt pasquinelli*

45F96A02EF5F452...

_____

Matt Pasquinelli

## SCHEDULE A

### HUMBL SHARES

| Transaction | Date | Shares | Price | Total |
|---|---|---|---|---|
| BUY | 2/3/2021 | 2,600 | $0.4819 | $1,260.02 |
| BUY | 2/4/2021 | 2,500 | $0.8499 | $2,129.70 |
| BUY | 2/4/2021 | 1,104 | $0.90 | $998.55 |
| BUY | 2/4/2021 | 2,000 | $0.779 | $1,562.95 |
| BUY | 2/5/2021 | 37 | $1.32 | $53.79 |
| BUY | 2/5/2021 | 699 | $1.43 | $1,004.52 |
| BUY | 2/5/2021 | 1,060 | $1.415 | $1,504.85 |
| BUY | 2/10/2021 | 1,050 | $1.38 | $1,453.95 |
| BUY | 2/16/2021 | 1,000 | $1.11 | $1,116.95 |
| BUY | 2/17/2021 | 1,250 | $0.945 | $1,188.20 |
| BUY | 3/30/2021 | 171 | $2.91 | $502.56 |
| BUY | 4/12/2021 | 250 | $2.715 | $678.75 |

### BLOCK ETX TRANSACTIONS

| Trading Pair | Date | Transaction | Quantity | Price | Price Per Unit |
|---|---|---|---|---|---|
| | | | | | |
| USD-BTC | 4/14/2021 | MARKET_BUY | 0.015886 | $1,003.09 | $63,144.35 |
| BTC-ETH | 4/14/2021 | MARKET_BUY | 0.085841 | 0.00318086 | 0.03705518 |
| BTC-ADA | 4/14/2021 | MARKET_BUY | 114.5426 | 0.00254742 | 0.00002224 |
| BTC-XTZ | 4/14/2021 | MARKET_BUY | 25.45263 | 0.00254373 | 0.00009994 |
| BTC-LINK | 4/14/2021 | MARKET_BUY | 4.478372 | 0.00255177 | 0.0005698 |
| BTC-IOTA | 4/14/2021 | MARKET_BUY | 79.8022 | 0.00256165 | 0.0000321 |
| BTC-EOS | 4/14/2021 | MARKET_BUY | 22.05762 | 0.00244479 | 0.00011583 |

DocuSign Envelope ID: 4809DD93-B46C-423C-9C7A-ABD1BC775981

| USD-BTC | 4/14/2021 | MARKET_BUY | 0.007915 | $500.27 | $63,204.62 |
|---------|-----------|------------|----------|---------|------------|
| USD-BTC | 4/14/2021 | MARKET_BUY | 0.012708 | $801.91 | $63,100.44 |
| BTC-ETH | 4/14/2021 | MARKET_BUY | 0.051414 | 0.00190598 | 0.0370714 |
| BTC-XLM | 4/14/2021 | MARKET_BUY | 131.2862 | 0.00126953 | 0.00000967 |
| BTC-COMP | 4/14/2021 | MARKET_BUY | 0.174615 | 0.00127322 | 0.00729158 |
| BTC-EOS | 4/14/2021 | MARKET_BUY | 10.97263 | 0.00126777 | 0.00011554 |
| BTC-XTZ | 4/14/2021 | MARKET_BUY | 12.74802 | 0.00127314 | 0.00009987 |
| BTC-LTC | 4/14/2021 | MARKET_BUY | 0.15172 | 0.00063444 | 0.00418164 |
| BTC-ADA | 4/14/2021 | MARKET_BUY | 28.57104 | 0.00063627 | 0.00002227 |
| BTC-LINK | 4/14/2021 | MARKET_BUY | 1.113307 | 0.00063379 | 0.00056929 |
| BTC-DGB | 4/14/2021 | MARKET_BUY | 392.2346 | 0.00063934 | 0.00000163 |
| USD-BTC | 4/14/2021 | MARKET_BUY | 0.007932 | $500.26 | $63,069.16 |
| USD-BTC | 4/14/2021 | MARKET_BUY | 0.007943 | $500.00 | $62,950.00 |
| USD-BTC | 4/14/2021 | MARKET_BUY | 0.007949 | $500.14 | $62,922.30 |
| BTC-ETH | 4/14/2021 | MARKET_BUY | 0.042979 | 0.00158946 | 0.03698254 |
| BTC-ADA | 4/14/2021 | MARKET_BUY | 71.73782 | 0.00159544 | 0.00002224 |
| BTC-XTZ | 4/14/2021 | MARKET_BUY | 15.96575 | 0.00158907 | 0.00009953 |
| BTC-EOS | 4/14/2021 | MARKET_BUY | 13.75896 | 0.00158792 | 0.00011541 |
| BTC-WAVES | 4/14/2021 | MARKET_BUY | 6.724662 | 0.00158937 | 0.00023635 |
| USD-BTC | 4/15/2021 | MARKET_BUY | 0.007978 | $500.02 | $62,672.76 |
| BTC-ETH | 4/15/2021 | MARKET_BUY | 0.040962 | 0.00159587 | 0.03895991 |
| BTC-ADA | 4/15/2021 | MARKET_BUY | 54.41262 | 0.0012776 | 0.00002348 |
| BTC-XTZ | 4/15/2021 | MARKET_BUY | 12.18635 | 0.00127408 | 0.00010455 |
| BTC-IOTA | 4/15/2021 | MARKET_BUY | 38.38004 | 0.00129148 | 0.00003365 |
| BTC-DGB | 4/15/2021 | MARKET_BUY | 797.825 | 0.00129247 | 0.00000162 |
| BTC-EOS | 4/15/2021 | MARKET_BUY | 10.64565 | 0.0012762 | 0.00011988 |
| USD-DOGE | 4/16/2021 | LIMIT_BUY | 1017.216 | $379.42 | $0.37 |
| USD-BTC | 4/19/2021 | MARKET_SELL | 0.00277 | $155.93 | $56,287.69 |
| BTC-ETH | 4/21/2021 | MARKET_BUY | 0.090316 | 0.00394001 | 0.04362484 |
| BTC-ADA | 4/21/2021 | MARKET_BUY | 139.4546 | 0.00315167 | 0.0000226 |
| BTC-XTZ | 4/21/2021 | MARKET_BUY | 15.42591 | 0.00157359 | 0.00010201 |
| BTC-DGB | 4/21/2021 | MARKET_BUY | 585.5539 | 0.00158099 | 0.0000027 |
| USD-BTC | 5/4/2021 | MARKET_BUY | 0.005495 | $296.40 | $54,139.94 |
| BTC-LTC | 5/4/2021 | MARKET_BUY | 0.243002 | 0.00137308 | 0.0056505 |
| BTC-DGB | 5/4/2021 | MARKET_BUY | 542.9684 | 0.00137913 | 0.00000254 |
| BTC-LTC | 5/4/2021 | MARKET_BUY | 0.224168 | 0.001265 | 0.00564308 |
| BTC-DGB | 5/4/2021 | MARKET_BUY | 498.689 | 0.00126667 | 0.00000254 |
| BTC-ETH | 5/4/2021 | MARKET_BUY | 0.017244 | 0.00105496 | 0.06117976 |
| BTC-ADA | 5/4/2021 | MARKET_BUY | 44.31555 | 0.00105515 | 0.00002381 |
| BTC-XTZ | 5/4/2021 | MARKET_BUY | 10.12198 | 0.00105531 | 0.00010426 |
| BTC-EOS | 5/4/2021 | MARKET_BUY | 8.713731 | 0.00105305 | 0.00012085 |
| BTC-WAVES | 5/4/2021 | MARKET_BUY | 1.649505 | 0.00103672 | 0.00064387 |
| BTC-ADA | 5/17/2021 | MARKET_SELL | 23.43204 | 0.00108794 | 0.00004643 |

| BTC-XTZ | 5/17/2021 | MARKET_BUY | 9.080544 | 0.00108035 | 0.00011972 |
|---------|-----------|------------|----------|------------|------------|
| BTC-ETH | 6/29/2021 | MARKET_SELL | 0.0252 | 0.00154444 | 0.06128779 |
| BTC-IOTA | 6/29/2021 | MARKET_BUY | 30.89097 | 0.00086216 | 0.00002791 |
| BTC-EOS | 6/29/2021 | MARKET_BUY | 5.045642 | 0.00057368 | 0.0001137 |
| BTC-ADA | 6/29/2021 | MARKET_SELL | 10.329 | 0.00039714 | 0.00003845 |
| BTC-XLM | 6/29/2021 | MARKET_BUY | 50.92068 | 0.00039208 | 0.0000077 |
| BTC-ETH | 6/29/2021 | MARKET_SELL | 0.016877 | 0.00102844 | 0.06093856 |
| BTC-XLM | 6/29/2021 | MARKET_BUY | 50.85455 | 0.00039107 | 0.00000769 |
| BTC-DGB | 6/29/2021 | MARKET_BUY | 148.1923 | 0.00019264 | 0.0000013 |
| BTC-XTZ | 6/29/2021 | MARKET_BUY | 4.655785 | 0.00037502 | 0.00008055 |
| BTC-LTC | 6/29/2021 | MARKET_BUY | 0.017348 | 0.00006968 | 0.00401671 |
| BTC-LINK | 6/29/2021 | MARKET_BUY | 0.126369 | 0.0000697 | 0.00055156 |
| BTC-EOS | 6/29/2021 | MARKET_BUY | 0.613915 | 0.0000697 | 0.00011353 |
| BTC-ADA | 6/29/2021 | MARKET_SELL | 31.7565 | 0.00122071 | 0.00003844 |
| BTC-XTZ | 6/29/2021 | MARKET_BUY | 14.13674 | 0.00113828 | 0.00008052 |
| BTC-ADA | 7/3/2021 | MARKET_SELL | 18.93584 | 0.00077902 | 0.00004114 |
| BTC-IOTA | 7/3/2021 | MARKET_BUY | 17.28744 | 0.00045811 | 0.0000265 |
| BTC-XTZ | 7/3/2021 | MARKET_BUY | 3.731078 | 0.0003209 | 0.00008601 |
| BTC-ADA | 7/3/2021 | MARKET_SELL | 47.31122 | 0.00194685 | 0.00004115 |
| BTC-DGB | 7/3/2021 | MARKET_BUY | 860.8947 | 0.00114498 | 0.00000133 |
| BTC-DGB | 7/3/2021 | MARKET_BUY | 241.2857 | 0.0003209 | 0.00000133 |
| BTC-XTZ | 7/3/2021 | MARKET_BUY | 6.871178 | 0.00048451 | 0.00008604 |
| BTC-LTC | 7/3/2021 | MARKET_SELL | 0.245752 | 0.00099216 | 0.00403724 |
| BTC-DGB | 7/3/2021 | MARKET_SELL | 355.3684 | 0.00046908 | 0.00000132 |
| BTC-ETH | 7/3/2021 | MARKET_SELL | 0.015429 | 0.0009884 | 0.06406027 |
| BTC-DGB | 7/3/2021 | MARKET_BUY | 748.7879 | 0.00099588 | 0.00000133 |
| BTC-XTZ | 7/3/2021 | MARKET_BUY | 6.867186 | 0.00059085 | 0.00008604 |
| BTC-ETH | 7/4/2021 | MARKET_SELL | 0.012073 | 0.00078854 | 0.06531407 |
| BTC-EOS | 7/4/2021 | MARKET_BUY | 2.422664 | 0.00028207 | 0.00011643 |
| BTC-DGB | 7/4/2021 | MARKET_BUY | 143.7519 | 0.00018543 | 0.00000129 |
| BTC-DGB | 7/4/2021 | MARKET_SELL | 623.3411 | 0.00079787 | 0.00000128 |
| BTC-XTZ | 7/4/2021 | MARKET_BUY | 1.783717 | 0.00015245 | 0.00008547 |
| BTC-LTC | 7/4/2021 | MARKET_SELL | 0.072476 | 0.00029294 | 0.00404188 |
| BTC-IOTA | 7/4/2021 | MARKET_BUY | 3.388327 | 0.00008707 | 0.0000257 |
| BTC-DGB | 7/4/2021 | MARKET_SELL | 215.3828 | 0.00027569 | 0.00000128 |
| BTC-LTC | 7/5/2021 | MARKET_SELL | 0.026739 | 0.00010913 | 0.00408136 |
| BTC-DGB | 7/5/2021 | MARKET_SELL | 83.60769 | 0.00010785 | 0.00000129 |
| BTC-ADA | 7/7/2021 | MARKET_SELL | 15.56137 | 0.00063879 | 0.00004105 |
| BTC-COMP | 7/7/2021 | MARKET_SELL | 0.063975 | 0.00087374 | 0.01365759 |
| BTC-EOS | 7/7/2021 | MARKET_BUY | 2.058316 | 0.00023365 | 0.00011352 |
| BTC-XTZ | 7/12/2021 | MARKET_SELL | 4.951887 | 0.00042011 | 0.00008484 |
| BTC-ADA | 7/12/2021 | MARKET_BUY | 6.751572 | 0.0002685 | 0.00003977 |
| BTC-ETH | 7/12/2021 | MARKET_BUY | 0.002424 | 0.0001516 | 0.06253506 |

DocuSign Envelope ID: 4809DD93-B46C-423C-9C7A-ABD1BC775981

| | | | | | |
|---|---|---|---|---|---|
| BTC-DGB | 7/12/2021 | MARKET_BUY | 41.93496 | 0.00005157 | 0.00000123 |
| BTC-XLM | 7/16/2021 | MARKET_SELL | 42.95974 | 0.0003282 | 0.00000764 |
| BTC-LINK | 7/16/2021 | MARKET_BUY | 0.260078 | 0.00012691 | 0.00048797 |
| BTC-DGB | 7/16/2021 | MARKET_BUY | 63.90984 | 0.00007796 | 0.00000122 |
| BTC-LTC | 7/16/2021 | MARKET_BUY | 0.018315 | 0.00007128 | 0.00389186 |
| BTC-XTZ | 7/16/2021 | MARKET_BUY | 0.655624 | 0.00005204 | 0.00007937 |
| BTC-ETH | 7/28/2021 | MARKET_SELL | 0.010172 | 0.00058615 | 0.05762336 |
| BTC-EOS | 7/28/2021 | MARKET_BUY | 6.006251 | 0.00058783 | 0.00009787 |
| BTC-ADA | 7/28/2021 | MARKET_BUY | 4.545566 | 0.00014813 | 0.00003259 |
| BTC-LINK | 8/3/2021 | MARKET_SELL | 0.269797 | 0.00015766 | 0.00058437 |
| BTC-COMP | 8/3/2021 | MARKET_BUY | 0.01554 | 0.00015819 | 0.01017969 |
| BTC-ADA | 8/3/2021 | MARKET_BUY | 3.152608 | 0.00010576 | 0.00003355 |
| BTC-XLM | 8/3/2021 | MARKET_BUY | 7.424893 | 0.00005189 | 0.00000699 |
| BTC-LTC | 8/3/2021 | MARKET_BUY | 0.013462 | 0.00004821 | 0.0035813 |
| BTC-ETH | 8/6/2021 | MARKET_SELL | 0.010531 | 0.00071422 | 0.06782388 |
| BTC-IOTA | 8/6/2021 | MARKET_BUY | 14.68257 | 0.00032022 | 0.00002181 |
| BTC-ADA | 8/6/2021 | MARKET_BUY | 4.949823 | 0.00016774 | 0.00003389 |
| BTC-LINK | 8/6/2021 | MARKET_BUY | 0.257745 | 0.00014812 | 0.00057468 |
| BTC-EOS | 8/6/2021 | MARKET_BUY | 0.645703 | 0.00006581 | 0.00010192 |
| BTC-ADA | 8/21/2021 | MARKET_SELL | 16.03589 | 0.00079457 | 0.00004955 |
| BTC-ADA | 8/21/2021 | MARKET_SELL | 20.96961 | 0.00103904 | 0.00004955 |
| BTC-ADA | 8/21/2021 | MARKET_SELL | 5.989781 | 0.00029667 | 0.00004953 |
| BTC-XTZ | 8/21/2021 | MARKET_BUY | 7.470398 | 0.00056416 | 0.00007552 |
| BTC-XTZ | 8/21/2021 | MARKET_BUY | 4.520452 | 0.00034138 | 0.00007552 |
| BTC-EOS | 8/21/2021 | MARKET_BUY | 4.220065 | 0.00046526 | 0.00011025 |
| BTC-ETH | 8/21/2021 | MARKET_BUY | 0.005403 | 0.00035916 | 0.06647123 |
| BTC-COMP | 8/21/2021 | MARKET_BUY | 0.030396 | 0.00029481 | 0.00969889 |
| BTC-LINK | 8/21/2021 | MARKET_BUY | 0.343 | 0.00018546 | 0.00057813 |
| BTC-XTZ | 8/27/2021 | MARKET_SELL | 8.116561 | 0.0007929 | 0.00009769 |
| BTC-ADA | 8/27/2021 | MARKET_SELL | 19.17109 | 0.00105824 | 0.0000552 |
| BTC-XTZ | 8/27/2021 | MARKET_SELL | 8.212504 | 0.00080236 | 0.0000977 |
| BTC-ADA | 8/27/2021 | MARKET_SELL | 7.108641 | 0.00039246 | 0.00005521 |
| BTC-ETH | 8/27/2021 | MARKET_BUY | 0.008579 | 0.00056586 | 0.06596035 |
| BTC-EOS | 8/27/2021 | MARKET_BUY | 5.356307 | 0.00054425 | 0.00010161 |
| BTC-ETH | 8/27/2021 | MARKET_BUY | 0.00611 | 0.00040305 | 0.06596034 |
| BTC-LINK | 8/27/2021 | MARKET_BUY | 0.717161 | 0.00037333 | 0.00052057 |
| BTC-IOTA | 8/27/2021 | MARKET_BUY | 13.66881 | 0.00029442 | 0.00002154 |
| BTC-IOTA | 8/27/2021 | MARKET_BUY | 14.46994 | 0.00016376 | 0.00002154 |
| BTC-XTZ | 8/29/2021 | MARKET_SELL | 4.245214 | 0.00051541 | 0.00012141 |
| BTC-XTZ | 8/29/2021 | MARKET_SELL | 5.128167 | 0.00062276 | 0.00012144 |
| BTC-IOTA | 9/5/2021 | MARKET_SELL | 15.08688 | 0.00054886 | 0.00003638 |
| BTC-EOS | 9/5/2021 | MARKET_BUY | 4.867331 | 0.00055219 | 0.00011345 |
| BTC-WAVES | 9/9/2021 | MARKET_SELL | 1.66471 | 0.00113954 | 0.00068453 |

DocuSign Envelope ID: 4809DD93-B46C-423C-9C7A-ABD1BC775981

| | | | | | |
|---|---|---|---|---|---|
| BTC-ADA | 9/9/2021 | MARKET_BUY | 10.76132 | 0.00057895 | 0.0000538 |
| BTC-EOS | 9/9/2021 | MARKET_BUY | 5.448749 | 0.00056225 | 0.00010319 |
| BTC-XTZ | 9/10/2021 | MARKET_SELL | 4.721005 | 0.00067231 | 0.00014241 |
| BTC-ADA | 9/10/2021 | MARKET_BUY | 10.10747 | 0.0005366 | 0.00005309 |
| BTC-XTZ | 9/11/2021 | MARKET_SELL | 3.390421 | 0.00050808 | 0.00014986 |
| BTC-ETH | 9/11/2021 | MARKET_BUY | 0.007093 | 0.00051206 | 0.07219312 |
| BTC-XTZ | 9/11/2021 | MARKET_SELL | 3.483862 | 0.00050313 | 0.00014442 |
| BTC-ETH | 9/11/2021 | MARKET_BUY | 0.007015 | 0.00050746 | 0.0723367 |
| BTC-XTZ | 9/14/2021 | MARKET_SELL | 3.171718 | 0.00052828 | 0.00016656 |
| BTC-XTZ | 9/14/2021 | MARKET_SELL | 3.090123 | 0.00051506 | 0.00016668 |
| BTC-ADA | 9/14/2021 | MARKET_BUY | 10.14463 | 0.00053046 | 0.00005229 |
| BTC-WAVES | 9/14/2021 | MARKET_BUY | 0.804004 | 0.00051652 | 0.00064243 |
| BTC-XTZ | 9/24/2021 | MARKET_SELL | 3.641168 | 0.0005946 | 0.0001633 |
| BTC-DGB | 9/24/2021 | MARKET_BUY | 540.8459 | 0.00059493 | 0.0000011 |
| BTC-XTZ | 9/25/2021 | MARKET_SELL | 2.963537 | 0.00051097 | 0.00017242 |
| BTC-EOS | 9/25/2021 | MARKET_BUY | 5.378983 | 0.00051148 | 0.00009509 |
| BTC-XTZ | 10/3/2021 | MARKET_SELL | 3.009479 | 0.00054904 | 0.00018244 |
| BTC-XTZ | 10/3/2021 | MARKET_SELL | 3.434017 | 0.0006265 | 0.00018244 |
| BTC-EOS | 10/3/2021 | MARKET_BUY | 6.067963 | 0.00055175 | 0.00009093 |
| BTC-ADA | 10/3/2021 | MARKET_BUY | 13.36511 | 0.00062909 | 0.00004707 |
| BTC-ADA | 10/12/2021 | MARKET_BUY | 21.15186 | 0.00077542 | 0.00003666 |
| BTC-ETH | 10/20/2021 | MARKET_SELL | 0.009014 | 0.00055532 | 0.06160523 |
| BTC-XTZ | 10/20/2021 | MARKET_BUY | 5.296402 | 0.00055675 | 0.00010512 |
| BTC-ETH | 10/25/2021 | MARKET_SELL | 0.008154 | 0.00054378 | 0.06669185 |
| BTC-XTZ | 10/25/2021 | MARKET_BUY | 5.222558 | 0.00054549 | 0.00010445 |
| BTC-ETH | 11/11/2021 | MARKET_SELL | 0.006991 | 0.00050478 | 0.07220395 |
| BTC-ETH | 11/11/2021 | MARKET_SELL | 0.00783 | 0.00056525 | 0.07219444 |
| BTC-COMP | 11/11/2021 | MARKET_BUY | 0.097433 | 0.00050953 | 0.00522954 |
| BTC-WAVES | 11/11/2021 | MARKET_BUY | 1.530922 | 0.00056723 | 0.00037052 |
| BTC-ETH | 11/24/2021 | MARKET_SELL | 0.008629 | 0.00065305 | 0.07567681 |
| BTC-ETH | 11/24/2021 | MARKET_SELL | 0.010396 | 0.00078677 | 0.07567687 |
| BTC-XTZ | 11/24/2021 | MARKET_BUY | 9.114883 | 0.00078707 | 0.00008635 |
| BTC-ADA | 11/24/2021 | MARKET_BUY | 22.07029 | 0.00065372 | 0.00002962 |
| BTC-ETH | 11/30/2021 | MARKET_SELL | 0.006534 | 0.00053129 | 0.08131123 |
| BTC-ADA | 11/30/2021 | MARKET_BUY | 19.53616 | 0.00053177 | 0.00002722 |
| BTC-ETH | 12/1/2021 | MARKET_SELL | 0.007821 | 0.00064086 | 0.08194281 |
| BTC-ADA | 12/1/2021 | MARKET_BUY | 23.46696 | 0.00064416 | 0.00002745 |
| BTC-ETH | 12/6/2021 | MARKET_SELL | 0.012264 | 0.00102528 | 0.08360256 |
| BTC-ADA | 12/6/2021 | MARKET_BUY | 37.72272 | 0.00102379 | 0.00002714 |
| BTC-IOTA | 1/4/2022 | MARKET_SELL | 17.41827 | 0.000501 | 0.00002874 |
| BTC-DGB | 1/4/2022 | MARKET_BUY | 697.7126 | 0.000502 | 0.00000072 |
| BTC-XTZ | 1/5/2022 | MARKET_SELL | 4.735031 | 0.000531 | 0.0001122 |
| BTC-DGB | 1/5/2022 | MARKET_BUY | 720.8311 | 0.000533 | 0.00000074 |

DocuSign Envelope ID: 4809DD93-B46C-423C-9C7A-ABD1BC775981

| BTC-ADA | 1/17/2022 | MARKET_SELL | 20.72796 | 0.000748 | 0.00003608 |
| BTC-ETH | 1/17/2022 | MARKET_BUY | 0.009805 | 0.000749 | 0.07639265 |
| BTC-ADA | 1/22/2022 | MARKET_SELL | 20.8001 | 0.0006 | 0.00002887 |
| BTC-WAVES | 1/22/2022 | MARKET_BUY | 2.407675 | 0.0006 | 0.00024915 |

## CERTIFICATION PURSUANT TO FEDERAL SECURITIES LAWS

I, Bryan Paysen, hereby certify that the following is true and correct to the best of my knowledge information and belief:

1.      I have reviewed the complaint in this action and authorize Scott+Scott Attorneys at Law to file it on my behalf.

2.      I am willing to serve as a representative party on behalf of all persons and entities that purchased, or otherwise acquired, HUMBL securities.

3.      During the relevant period, I purchased and/or sold the security that is the subject of the complaint, as set forth in the attached **Schedule A.**

4.      I did not engage in the foregoing transactions at the direction of counsel nor in order to participate in any private action arising under the Securities Act of 1933 (the "Securities Act") or the Securities Exchange Act of 1934 (the "Exchange Act").

5.      During the three-year period preceding the date of my signing this Certification, I have not sought to serve, or served, as a representative party or lead plaintiff on behalf of a class in any private action arising under the Securities Act or the Exchange Act.

6.      I will not accept any payment for serving as a representative party on behalf of the Class beyond the *pro rata* share of any recovery, expert for such reasonable costs and expenses (including lost wages) directly related to the representation of the Class as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on 19th May, 2022 at Round Rock, TX

DocuSigned by:

*BRYAN PAYSEN*

013EDE8D69EA4EF...

Bryan Paysen

## SCHEDULE A

| TRANSACTION | DATE | SHARES | TOTAL |
|:---:|:---:|:---:|:---:|
| Buy | 11/30/2020 | 25 | $3.75 |
| Buy | 11/30/2020 | 103 | $15.45 |
| Buy | 11/30/2020 | 250 | $37.50 |
| Buy | 11/30/2020 | 3,847 | $577.05 |
| Buy | 11/30/2020 | 5,000 | $750 |
| Buy | 11/30/2020 | 8,000 | $1,200 |
| Buy | 11/30/2020 | 12,000 | $1,800 |
| Buy | 11/30/2020 | 32,975 | $4,946.25 |
| Buy | 11/30/2020 | 50,000 | $7,500 |
| Buy | 11/30/2020 | 50,000 | $7,500 |
| Buy | 11/30/2020 | 87,800 | $13,170 |
| Buy | 11/30/2020 | 20,000 | $3,780 |
| Buy | 11/30/2020 | 58,600 | $11,075.40 |
| Buy | 11/30/2020 | 80,000 | $15,120 |
| Buy | 11/30/2020 | 91,400 | $17,274.60 |
| Buy | 11/30/2020 | 2,000 | $1,512.40 |
| Buy | 11/30/2020 | 4,250 | $3,213.85 |
| Buy | 12/1/2020 | 10,000 | $1,800 |
| Buy | 12/1/2020 | 11,361 | $2,044.98 |
| Buy | 12/1/2020 | 13,639 | $2,455.02 |
| Buy | 12/1/2020 | 15,000 | $2,700 |
| Buy | 12/1/2020 | 50,000 | $9,000 |
| Buy | 12/1/2020 | 50,000 | $9,000 |

DocuSign Envelope ID: 3B30AA9F-45EC-480B-8724-B1D0F71F847A

| Buy | 12/2/2020 | 700 | $350 |
|-----|-----------|-----|------|
| Buy | 12/2/2020 | 721.25 | $358.61 |
| Buy | 12/2/2020 | 3,893.75 | $1,946.88 |
| Buy | 12/2/2020 | 7,185 | $3,572.38 |
| Sell | 12/3/2020 | 400,000 | $61,898.88 |
| Sell | 12/3/2020 | 20,000 | $2,799.94 |
| Sell | 12/3/2020 | 58,600 | $8,203.82 |
| Sell | 12/3/2020 | 80,000 | $11,199.75 |
| Sell | 12/3/2020 | 91,400 | $12,795.72 |
| Buy | 12/7/2020 | 12,500 | $14,445.90 |
| Buy | 12/9/2020 | 617.25 | $567.87 |
| Buy | 12/9/2020 | 632.75 | $582.13 |
| Buy | 12/9/2020 | 1,000 | $960 |
| Buy | 12/9/2020 | 1,250 | $1,150 |
| Buy | 12/9/2020 | 5,542 | $5,320.32 |
| Buy | 12/9/2020 | 5,958 | $5,719.68 |
| Buy | 12/9/2020 | 10,000 | $9,200 |
| Buy | 12/10/2020 | 12,500 | $11,000 |
| Buy | 12/16/2020 | 350 | $122.78 |
| Buy | 12/16/2020 | 900 | $315.59 |
| Buy | 12/16/2020 | 6,250 | $2,203.50 |
| Buy | 12/16/2020 | 6,250 | $2,500 |
| Buy | 12/16/2020 | 8,750 | $3,067.75 |
| Buy | 12/16/2020 | 34 | $15.35 |
| Buy | 12/18/2020 | 5,000 | $2,258 |
| Buy | 12/18/2020 | 7,341 | $3,315.20 |

DocuSign Envelope ID: 3B30AA9F-45EC-480B-8724-B1D0F71F847A

| Buy | 12/28/2020 | 6,250 | $5,200 |
|-----|-----------|-------|--------|
| Buy | 1/26/2021 | 660 | $1,108.54 |
| Buy | 1/26/2021 | 3,000 | $5,038.80 |
| Buy | 1/27/2021 | 2,437.50 | $3,794.70 |
| Buy | 1/28/2021 | 13 | $19.05 |
| Buy | 1/28/2021 | 40 | $65.85 |
| Buy | 1/28/2021 | 32 | $46.89 |
| Buy | 1/28/2021 | 50 | $73.26 |
| Buy | 1/28/2021 | 87 | $127.47 |
| Buy | 1/28/2021 | 100 | $146.52 |
| Buy | 1/28/2021 | 100 | $146.52 |
| Buy | 1/28/2021 | 100 | $146.52 |
| Buy | 1/28/2021 | 156 | $228.57 |
| Buy | 1/28/2021 | 159 | $232.97 |
| Buy | 1/28/2021 | 200 | $293.04 |
| Buy | 1/28/2021 | 268 | $392.67 |
| Buy | 1/28/2021 | 324.5 | $475.46 |
| Buy | 1/28/2021 | 357 | $523.08 |
| Buy | 1/28/2021 | 466 | $682.78 |
| Buy | 2/10/21 | 1,022.5 | $5,317 |
| Buy | 2/11/2021 | 250 | $1,340 |
| Buy | 2/12/2021 | 118.75 | $615.13 |
| Buy | 2/22/2021 | 906.25 | $4,158.86 |
| Buy | 2/22/2021 | 1.5 | $7.05 |
| Buy | 2/23/2021 | 20 | $80.40 |
| Buy | 2/25/2021 | 205 | $848.70 |

| Buy | 3/2/2021 | 75 | $341.55 |
| Buy | 3/10/2021 | 575 | $1,850.35 |
| Buy | 3/2/2021 | 3,961 | $17,182.82 |
| Buy | 3/26/2021 | 2,225 | $8,099 |
| Buy | 5/5/2021 | 9 | $12.83 |
| Buy | 5/21/2021 | 5 | $4.18 |
| Buy | 5/21/2021 | 20 | $18.79 |
| Buy | 5/21/2021 | 25 | $23.45 |
| Buy | 6/22/2021 | 100 | $117.35 |
| Buy | 6/22/2021 | 450 | $528.75 |
| Buy | 8/18/2021 | 1,000 | $751.85 |
| Buy | 8/20/2021 | 300 | $236.88 |
| Buy | 8/30/2021 | 700 | $621.60 |
| Buy | 8/30/2021 | 1,000 | $893 |
| Buy | 8/30/2021 | 2,000 | $1,786 |
| Buy | 8/30/2021 | 2,856 | $2,439.02 |
| Buy | 8/31/2021 | 5,000 | $4,125 |
| Buy | 9/2/2021 | 700 | $575.05 |
| Buy | 9/2/2021 | 1,444 | $1,188.41 |
| Buy | 9/3/2021 | 1,090 | $1,019.15 |
| Buy | 9/3/2021 | 8,910 | $8,330.85 |
| Buy | 9/17/2021 | 357 | $310.16 |
| Buy | 9/17/2021 | 4,143 | $3,599.85 |
| Sell | 10/21/2021 | 102,234 | $66,452.20 |
| Sell | 10/21//2021 | 9,910 | $6,465.47 |
| Sell | 10/21/2021 | 54,500 | $35,441.17 |